IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |  |
|---|---|---|---|
| BERNARD MIMS, | | ) | |
| | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | No.  11 C 6794 |
| v. | | ) | |
| | | ) | |
| MARCUS HARDY, et al, | | ) | Judge Virginia M. Kendall |
| | | ) | |
| | Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Bernard Mims, an inmate in the custody of the Illinois Department of Corrections, brings this action against Defendants Marcus Hardy, Darryl Edwards, Sytera Sanders, Darryl Coleman, and Jose Prado (collectively the "Defendants"), pursuant to 42 U.S.C. § 1983 *et seq*, alleging unconstitutional conditions of confinement at Stateville Correctional Center.  Specifically, Mims alleges the Defendants violated his Eighth Amendment right against cruel and unusual punishment by forcing him to live in a cell with no running water and a broken toilet for 45 days.  Mims alleges that as a result, he was forced to eat dirty ice to quench his thirst, unable to bathe himself, subjected to the smell of urine and feces, and forced to hold his bowel movements for prolonged periods of time.  The Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that no genuine issue of material fact exists because (1) Mims failed to exhaust his administrative remedies prior to filing this federal lawsuit, and (2) the alleged conditions of Mims's confinement do not, as a matter of law, rise to the level of a constitutional violation.  For the reasons stated herein, Defendant's Motion for Summary Judgment is granted in part and denied in part.

1

## <u>STATEMENT OF MATERIAL UNDISPUTED FACTS</u>[1]

Mims is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and is currently incarcerated at Stateville Correctional Center ("Stateville"). (Def. 56.1 St. ¶ 1.) Mims alleges that while at Stateville, he was deprived of running water and a functioning toilet from June 1, 2011 through July 15, 2011, approximately 45 days. (*Id.* ¶ 3.) Mims wrote letters and emergency grievances regarding the issues in his cell to the following individuals: Marcus Hardy, the Warden at Stateville; Darryl Edwards, the Assistant Warden of Programs at Stateville; Darryl Coleman, the Assistant Warden of Operations at Stateville; and Sytera Sanders, a correctional counselor. (*Id.* ¶ 4.) According to Mims, none of these individuals took corrective action. (*Id.*) Mims also brought these issues to the attention of Jose Prado, a correctional sergeant who supervised Mims at Stateville. (*Id.*) According to Mims, Prado placed numerous work orders to have the water turned back on to no avail. (Dkt. No. 60-1, p. 17.)

With respect to Mims's access to fluid and beverages, Mims does not allege that he received no beverages from June 1 to July 14, 2011, but rather that he was unable to drink water from the sink in his cell. (Def. 56.1 St. ¶ 29.) Inmates at Stateville receive three meals per day; breakfast is brought to the inmate's cell and inmates go to the prison cafeteria, also known as "chow," for lunch and dinner.[2] (*Id.* ¶ 25.) Mims received beverages with his food when it was

---

[1] Citations to Defendants' Statement of Undisputed Facts (Dkt. No. 60) have been abbreviated to "Def. 56.1 St. ¶ __". Mims did not submit a response to Defendants' 56.1 Statement or submit a statement of his own. Accordingly, all facts alleged in Defendants' 56.1 Statement will be deemed admitted. *See* N.D. Ill. R. 56.1(b)(3)(C); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (district court may deem admitted a defendant's properly supported assertions of fact that are not controverted by the plaintiff with citations to evidence in the record); *Wilson v. Kautex, Inc.*, 371 Fed.Appx. 663, at *1 (7th Cir. 2010) (unpublished) (strictly enforcing Local Rule 56.1 was well within the district court's discretion even though the plaintiff was a *pro se* litigant where defendant notified plaintiff that it planned to move for summary judgment and explained what she would have to do in response).

[2] During a prison lockdown all meals are brought to the inmates' cells. (*Id.* ¶ 25.)

brought to his cell and had the option to go to the prison cafeteria for lunch and dinner, where he had access to cups of water. (*Id.* ¶¶ 26–27.)   In addition, Mims had the option to purchase beverages from the prison commissary. (*Id.* ¶ 28.)

Mims also held a job in the prison laundry room and had access to the bathroom at all times while working there. (*Id.* ¶¶ 21–22.)   However the number of hours Mims worked, and thus his access to the laundry room toilet, varied. (*Id*; Mims Dep., p. 21–22.)   Mims was not able to go to work on days the prison was on lockdown or when his supervisor was unavailable. (*Id.*)   Stateville was on lockdown a total of four days between June 1 and July 14, 2011. (*Id.* ¶ 20.)   Lastly, Mims was allowed three showers per week in accordance with IDOC policy but chose not to use the shower because he did not like to shower with other men. (*Id.* ¶¶ 23–24.)

## I.     IDOC's Grievance Process

Upon arrival at an Illinois correctional facility, inmates are informed of the rules and regulations of the institution and IDOC through an orientation manual and oral presentation. (*Id.* ¶ 11.)   The orientation includes a presentation on the IDOC's formal grievance process for inmates seeking to file complaints regarding prison life. (*Id* ¶¶ 5, 11.)   In addition, counselors are available to answer inmates' questions about the facility's policies and procedures. (*Id.*)

Generally there are three steps to the grievance process. (*Id.* ¶ 6.)   First, an inmate must attempt to resolve grievances informally through his counselor. (*Id.*)   If the grievance, complaint, or issue remains unresolved, an inmate may file a written grievance within sixty days of an incident. (*Id.*)   The filing of a written grievance on a grievance form is considered the second step of the formal grievance process. (*Id.*)   Prison employees are available to aid inmates in the preparation of such grievances and all inmates are entitled to take advantage of the grievance procedure. (*Id.*)   Once a grievance is received by the Grievance Office at Stateville, it is logged

on the date of receipt and placed in a file kept in the office. (*Id.* ¶ 15.)  Originals of the grievances that are properly filed with the Grievance Office are kept in the inmate's master file, which is located at the facility where the inmate is housed. (*Id.*)

Prison employees serve as grievance officers unless a given employee is directly related to the subject matter of the grievance. (*Id.* ¶ 6.)  The grievance officer may personally interview the inmate and/or witnesses as deemed appropriate and obtain relevant documents to determine the merits of the inmate's grievance. (*Id.*)  Once this process is completed, the grievance officer generates a report containing the findings of the investigation, the grievance officer's conclusions, and, if appropriate, a recommendation for relief. (*Id.*)  The grievance and the grievance officer's report are then forwarded to the Chief Administrative Officer/Warden ("CAO") or the CAO's designee for review and signature. (*Id.*)  The grievance officer's report with the CAO or designee's final decision is then submitted back to the inmate (*Id.*)

If the inmate disagrees with the CAO's or designee's decision, he may appeal in writing to the Director of the Department of Corrections by submitting the grievance officer's report and CAO's decision. (*Id.* ¶ 7.)  The Administrative Review Board ("ARB"), as the Director's designee, reviews the appeal and first determines whether the inmate's grievance can be handled without a hearing. (*Id.*)  If so, the inmate is so advised. (*Id.*)  If not, the matter is scheduled for an ARB hearing involving an interview of the grieving inmate, examining relevant documents, and, at the ARB's discretion, calling witnesses. (*Id.*)  The ARB submits a written report of its findings and recommendations to the Director or designee, who reviews the report and makes a final determination on the grievance. (*Id.*)  A copy of the ARB's report and the Director's final decision are sent to the inmate who filed the grievance. (*Id.*)  The originals of these documents

are maintained in the ARB file. (*Id.*)  The grievance procedures provides no further means of review beyond this step. (*Id.*)

If an inmate deems his grievance to be an emergency, he may request that the grievance be reviewed on an expedited basis by submitting it directly to the facility CAO or the CAO's designee rather than a counselor or grievance officer. (*Id.* ¶ 8.)  Grievances filed in this manner will be handled on an emergency basis if the CAO or designee determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the inmate. (*Id.*)  If the CAO or designee determines that the grievance does not warrant emergency review or processing, Stateville requires that the inmate start over and resubmit the grievance in accordance with the standard grievance process described above. (*Id.*)  However an inmate may appeal the CAO's decision to deny emergency review or processing to the ARB. (*Id.*)  These appeals are handled in the same manner as appeals filed through the IDOC's regular grievance process. (*Id.*)

Certain issues may be addressed directly to the ARB rather than through a counselor or grievance officer. (*Id.* ¶ 9.)  These issues are limited to: (1) decisions involving the involuntary administration of psychotropic medication; (2) decisions regarding protective custody placement, including continued placement in or release from protective custody; (3) decisions regarding disciplinary proceedings which were made at a facility other than the facility where the inmate is currently assigned; and (4) other issues except personal property issues which pertain to a facility other than the facility where the inmate is currently assigned. (*Id.*)  Grievances that can be addressed directly to the ARB are handled in the same manner as appeals filed through IDOC's regular grievance process. (*Id.* ¶ 10.)

## II.     Mims's Grievances

A review of the records for grievances submitted by Mims revealed that Mims filed four emergency grievances between June 1 and July 14, 2011. (*Id.* ¶ 14.)   The first emergency grievance is dated June 8, 2011 and was received by the ARB on August 5, 2011. (*Id.* Exhibit E.) Mims stated in his first grievance that on June 1, 2011, the running water and toilet in his cell ceased working due to plumbing problems. (*Id.*)   Mims also stated that he complained of the issues to Defendant Prado, who placed numerous work orders to have the water turned back on to no avail. (*Id.*)   According to Stateville's records, a work order was created and repairs to the plumbing in Mims's cell were completed on June 17, 2011. (*Id.* ¶¶ 18–19.)   The records also indicate that Stateville first documented the problems in Mims's cell on June 7, 2011. (*Id.* ¶ 18.) On July 1, 2011, however, Mims filed a second emergency grievance complaining of the same running water and toilet issues that had, according to Stateville's records, been repaired two weeks prior. (*Id.*)   In this grievance form, which was also received by the ARB on August 5, 2011, Mims stated that the summer heat and lack of running water were taking a serious toll on his health. (*Id.* Exhibit E.)

On August 11, 2011, Sarah Johnson, Chairperson with the ARB/Office of Inmate Issues for the IDOC, wrote to Mims informing him that both grievances were deemed non-emergencies. (*Id.* ¶¶ 14, 17.)   Because his complaints were deemed non-emergencies, Mims was informed that his grievances would be returned for failure to comply with the IDOC's standard grievance procedure, which required that he submit a grievance officer's report and CAO response as required for appeal. (*Id.* ¶¶ 14, 17.)   Johnson received a third emergency grievance from Mims on August 15, 2011.   In the third grievance, dated July 10, 2011, Mims again complained of excessive heat and a lack of running water. (*Id.*)   On August 17, 2011, Johnson sent

correspondence to Mims informing him that his third grievance would also not be deemed an emergency would be returned due to his failure submit a grievance officer's report and CAO response. (*Id.* ¶ 14.) Johnson received a duplicate of the third grievance on September 6, 2011, which she marked as a "duplicate file" and filed away without review and processing. (*Id.*) A search of grievances filed by Mims in June and July 2011 revealed no indication that Mims resubmitted his grievances in accordance with the regular grievance process at Stateville. (*Id.* ¶ 16.) A search of Mims's master file also revealed no grievance officer reports regarding the aforementioned issues. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*,

134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

As the party opposing the motion for summary judgment, Mims "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314 (7th Cir. 2011). However, she cannot rely on mere conclusions and allegations to create factual issues. *Bladerston v. Fairbanks Morse Engine Div. Of Coltec Ind.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).

<u>**DISCUSSION**</u>

I.      **Mims has Properly Exhausted his Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") provides in relevant part that "no action shall be brought with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001); *Pavey v. Conley*, 528 F.3d 494 (7th Cir. 2008). Congress passed this provision in an attempt to eliminate unwarranted interference by federal courts with the administration of prisons, and "to affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford v. Ngo,* 548 U.S. 81, 93 (2006) (internal quotations and citations omitted). Accordingly, if a prisoner fails to exhaust his administrative remedies before filing

suit, the district court must dismiss the complaint without reaching the merits. *See Perez v. Wisconsin Department of Corrections,* 182 F.3d 532, 535–36 (7th Cir. 1999).

"The contours of the exhaustion requirement are set forth by the prison grievance system in each state." *Jones v. Bock*, 549 U.S. 199, 218 (2007). In order to properly exhaust administrative remedies in Illinois, inmates are required to follow the regulations contained in the IDOC's "Grievance Procedures for Offenders," as codified in the Illinois Administrative Code, Title 20 §§ 504.800 *et seq* (2010) (the "Code"). As outlined in the Defendants' Rule 56.1 Statement, the proper grievance procedure for IDOC inmates normally includes a three-step process which begins with an attempt to resolve the issue informally through a prison counselor, then proceeds to review on the institutional level, and finally ends with an administrative appeal to the Director of the Department of Corrections, who has delegated review authority to the ARB. *See* 20 Ill. Admin. Code §§ 504.810, 504.830. However pursuant to § 504.840 of the Code, an inmate may request that a grievance be handled on an emergency basis by submitting the grievance directly to the prison warden. 20 Ill. Admin. Code § 504.840. If the warden determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm, the grievance is to be handled on an emergency basis. 20 Ill. Admin. Code § 504.840. The process also provides: "If, after receiving the response of the [warden], the offender still feels that the problem, complaint, or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision." 20 Ill. Admin. Code § 504.850.

Insofar as the exhaustion requirement, the crux of the dispute between the parties in this case is whether Mims properly followed the IDOC's grievance process after Defendants Hardy and Sanders determined his grievances would not be treated as emergencies. According to the

Defendants, once it was decided that Mims's grievances did not warrant emergency treatment, Mims was required to resubmit the grievances using the non-emergency process set forth in Section 504.810 of the Code. Defendants argue that Mims's decision to file a federal lawsuit before doing so constitutes a failure to exhaust the IDOC's administrative remedy process. This argument has been rejected for years by the Seventh Circuit Court of Appeals and district courts within this Circuit. *See Thorton v. Snyder*, 428 F.3d 690 (7th Cir. 2005) (regulatory text does not require inmates to file new grievance after being denied emergency treatment); *Glick v. Walker*, 385 Fed.Appx. 579 (7th Cir. 2010) (unpublished) (inmate not required to resubmit grievance through normal channels after warden finds expedited review unnecessary); *Muhammad v. McAdory*, 214 Fed.Appx. 610, 612–13 (7th Cir. 2007) (unpublished) (inmate not required to resubmit grievance through standard procedure after warden concluded it was not an emergency); *Dixon v. Schaefer*, No. 11 C 6860, 2013 WL 941971, at *3 (N.D. Ill. Mar. 11, 2013) (Kocoras, J.) (inmate not required to resubmit grievance through normal IDOC grievance process after being denied emergency treatment, finding that "[a]lthough the grievance form directed inmates to submit a regular grievance if no emergency grievance had been substantiated,[3] the governing regulations themselves do not dictate such a requirement"); *Johnson v. Ghosh*, No. 10 C 6897, 2011 WL 2604837, at *4 (N.D. Ill. June 30, 2011) (Leinenweber, J.) (inmate who files emergency grievance has no obligation to resubmit the grievance through normal channels after warden determines the grievance does not warrant expedited review); *Haywood v. Hathaway*, No. 09-cv-0807-MJF-SCW, 2011 WL 1775734, at *2–3 (S.D. Ill. Apr. 22, 2011) (adopting Magistrate Judge's Report and Recommendation rejecting defendant's argument that plaintiff

---

[3] The grievance forms returned to Mims contained similar direction: "an emergency is not substantiated. Offender should submit this grievance in the normal manner." (Dkt. No. 60-1, p. 17.)

must re-file through normal grievance process after ARB denied emergency treatment, returned plaintiff's grievance, and never made a final determination on the merits, finding that such a procedure "is not explicitly provided for anywhere in the administrative code" and that the defendant's "remedy for changing this outcome … is not with this Court. Instead, his remedy lies with the Bureau of Prisons, and an amendment to the Illinois Administrative Code clarifying the sparsely defined IDOC emergency grievance procedures"); *Walker v. Mahone*, No. 09-1128, 2010 WL 5071571, at *3 (C.D. Ill. Dec. 8, 2010) ("The Defendant fails to acknowledge *Thorton* and provides no evidence in support of her claim that the Plaintiff had to resubmit her grievance [after the warden determined that emergency review was not substantiated]."); *Cooper v. Evans*, No. 08-cv-0742-MJR-CJP, 2010 WL 3895702, at *3 (S.D. Ill. Sept. 29, 2010) (inmate who seeks emergency review under § 504.840 has no obligation to resubmit the grievance through normal channels).

For example, in *Thorton*, the defendants argued that emergency grievances filed by inmates "ceased to exist" once corrections officials deemed the grievance a non-emergency. 428 F.3d at 694. The *Thorton* court rejected the defendants' argument. *Id*. Like the response Mims received from the ARB in this case, the response Thorton received from the warden "made no comment on the merits of the grievance and indicated only that the warden did not consider the complaint worthy of emergency treatment." *Id*. The court flatly rejected the defendants' argument, finding "nothing in the current regulatory text … that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis." *Id*.

Similarly, in *Glick*, the inmate-plaintiff filed an emergency grievance that the warden concluded did not constitute an emergency. 385 Fed.Appx. at 583. The plaintiff appealed the decision to the ARB, which agreed with the warden and instructed the plaintiff to start over by

11

submitting his grievance to his institution's grievance officer. *Id.* The court stated the following in response to the defendants' argument that the plaintiff had failed to exhaust his administrative remedies:

> The defendants' position that [the plaintiff] was required to go back to the grievance officer and start over after his emergency grievance had been rejected by the warden and the ARB is at odds with 20 Ill. Admin. Code § 504.840 and *Thorton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005). In *Thorton*, … we explained that an inmate who seeks emergency review under § 504.840 has no obligation to resubmit the grievance through normal channels, even if the warden concluded that expedited review was unnecessary. The defendants cannot use the exhaustion requirement to demand that an inmate do more than what the administrative rules require.

*Id* (citing *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006), and *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)).

The Defendants' attempts to distinguish *Thorton* and *Glick* are not persuasive. First, the Defendants point out that the plaintiff in *Thorton*, unlike Mims, received the relief sought (a clean mattress) after filing his emergency grievance and was thus excused from appealing the denial of emergency treatment to the ARB. However, the Defendants fail to convincingly explain why this distinction is of consequence with respect to the issue presented here. It is undisputed that Mims's grievances were denied by the CAO *and* considered on appeal by the ARB. Thus the issue here is not whether Mims was excused from appealing but whether the Defendants, after denying Mims emergency treatment on appeal, acted appropriately in requiring Mims to start the grievance process over in order to satisfy the PLRA's exhaustion requirement. Because such a procedure is not explicitly provided for in the Code, the Court finds that the Defendants asked Mims to go above and beyond what was required by the IDOC's grievance process in order to exhaust his administrative remedies. *Dole*, 438 F.3d at 810 ("[W]hen a grievance meets all of the Administrative Code's written requirements, it cannot be dismissed

because of a requirement on which 'the administrative rulebook is silent.' ") (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).

Defendants also argue that *Glick* is distinguishable because unlike Mims, the plaintiff in *Glick* could not re-file his grievance through the normal grievance process due to his transfer to another correctional facility. Yet, the court in *Glick* found in the plaintiff's favor not because he was unable to resubmit his grievance but rather because the "[t]he defendants offered no evidence to support their contention that [the plaintiff] was required to do something more after his emergency grievance had been rejected by the warden and by the ARB." *Glick*, 385 Fed.Appx. at 583. The factual incongruity highlighted by the Defendants is irrelevant to that holding.

Defendants also point to the fact that they, unlike the defendants in *Glick*, have provided evidence of a prison policy requiring inmates to resubmit grievances through the normal channels after being denied emergency treatment. Specifically, the Defendants note that Sarah Johnson, the ARB Chairperson, and Shaun Bass, a correctional counselor and grievance officer at Stateville, have submitted affidavits stating that Stateville requires inmates to resubmit grievances through the non-emergency process in the event that their emergency grievance is denied. However, the Seventh Circuit has made clear that prison officials cannot require inmates to do more than what the Administrative Code demand. *See Glick*, 385 Fed.Appx. at 583. Thus, "prison administrators may not frustrate an inmate's efforts to comply with the administrative review process by imposing hurdles that are not part of the established grievance procedure." *Muhammad*, 214 Fed.Appx. at 613) (citing *Strong*, 297 F.3d at 650). The phrase "established grievance procedure" refers to those procedure set forth in the Illinois Administrative Code and does not encompass not any additional requirements imposed by a particular facility. *See, e.g.,*

13

*Ruiz v. Tillman*, No. 06 C 1975, 2009 WL 528680, at *5 (N.D. Ill. Feb. 25, 2009) (inmate was not obligated to follow the grievance procedures established by the prison, but rather those set forth in the Illinois Administrative Code); *Johnson*, 2011 WL 2604837, at *4 ("Hardy included an affidavit from Sarah Johnson of the Office of Inmate Issues for the Illinois Department of Correction, stating that the ARB refused to review [the plaintiff's] grievances because he did not include forms that showed a response from the grievance officer or warden. This would have necessarily required [the plaintiff] to resubmit his grievances through the normal process, but Defendants present no evidence that anything in the Administrative Code required [the plaintiff] to do so."); *Haywood*, 2011 WL 1775734, at *2–3 (rejecting defendants' argument that inmate must resubmit grievance after denial through emergency process despite Warden's testimony at hearing that this was the standard procedure followed by his prison). Accordingly, the Court declines to impose an additional exhaustion requirement based on Stateville's practices and finds that Mims fully exhausted his administrative remedies using the emergency grievance process set forth in the Code.

### II. A Genuine Issue of Material Fact Exists as to Whether Defendants Violated the Eighth Amendment

A jail official violates the Eighth Amendment if the official is "deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' including adequate sanitation and personal hygiene items." *Budd v. Motley*, 711 F.3d 840 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and citing *Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012), and *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006)). This standard calls for a two-part inquiry: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measures of life's necessities; and (2) subjectively,

whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *See Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294 (1991).

### A.    Conditions of Confinement

A plaintiff's conditions of confinement must result in "extreme deprivations" in order to meet the first prong of the Eighth Amendment inquiry. *Hudson v. McMillian*, 503 U.S. 1, 8–9 (1992).  "Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' 'only those deprivations denying the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation.' " *Id.* at 9 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Courts in this Circuit have held that short-term breakdown of an inmate's in-cell plumbing where the inmate is otherwise provided with food, beverages, access to showers, and access to toilets, does not rise to the level of a constitutional violation. *See, e.g., Muhammad v. Wilson*, No. 05 C 743, 2006 WL 2413710, at *2–3 (N.D. Ill. Aug. 16, 2006) (broken plumbing for seven days where plaintiff was given three meals a day, including beverages with each meal, "was an inconvenience" and "did not amount to a constitutional violation"); *Easter v. Cooper*, No. 91 C 4520, 1995 WL 109343, at *3 (N.D. Ill. Mar. 10, 1995) (no running water for seven days constitutes an inconvenience but does not violate the Constitution); *Tesch v. County of Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (denial of drinking water for several days is not a constitutional violation when inmates receive beverages with each of his three daily meals); *Davis v. Biller*, No. 00 C 50261, 2003 WL 22764872, at *2 (N.D. Ill. Nov. 19, 2003) (inmate has a basic right to drinking water but a dysfunctional sink alone is not necessarily cruel and unusual punishment).

15

In this case, it is clear from the record that Mims was not deprived of drinking water and beverages. Rather, he was only unable to obtain water from the sink within his cell. Mims had access to water or some form of beverage three times a day as part of his regular meal schedule and was able to fill his water bottle using a hose. Mims also had the ability to purchase beverages from the prison commissary. Under these circumstances, the Court finds as a matter of law that Mims's lack of access to drinking water from the sink in his cell does not rise to the level of a constitutional violation.

There are, however, disputed issues of fact pertaining Mims's ability to access a working toilet during the 45 day period between June 1, 2011 and July 14, 2011. The parties dispute both the severity of the conditions to which Mims was subjected and the duration for which he had to endure them. Both issues are material to the determination of whether the Defendants violated Mims's Eighth Amendment right against cruel and unusual punishment. Courts have held that unsanitary conditions of confinement stemming from broken plumbing may rise to the level of an Eighth Amendment violation. *See Vinning-El v. Long*, 482 F.3d 923, 924–25 (7th Cir. 2007) (reversing district court's grant of summary judgment on the basis of qualified immunity where plaintiff-inmate was held for six days without sanitation items in cell contaminated with human waste and in which sink and toilet did not work, finding "clearly established" precedent "well before 2001" that among other cell conditions, a broken sink and toilet and exposure to human feces violated the Eighth Amendment by depriving a prisoner of the "minimal civilized measure of life's necessities"); *Johnson v. Pelker*, 891 F.2d 136, 139–40 (7th Cir. 1989) (reversing district court's decision to grant summary judgment where prisoner was denied cleaning supplies and confined for three days to cell that was smeared with human waste and lack of running water); *Robinson v. DeTella*, No. 95 C 4463, at *5 (N.D. Ill. Feb. 5, 1997) (broken toilet did not flush

properly an exposed inmate to his own waste, along with filthy state of cell and exposure to cold air were the "type of conditions found unconstitutional for decades"); *see also Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (summary judgment improper where inmate alleged he lived with "filth, leaking inadequate plumbing, roaches, rodents, the constant smell of human waste, … [and] unfit water to drink").[4]

Furthermore, the objective component of the Eighth Amendment inquiry requires the Court to assess not only the severity of the violation but its duration as well. *See Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) (distinguishing several cases involving similar type of deprivation and holding that "it is not just the severity of the cold, but the duration of the condition, which determines whether the conditions of confinement are unconstitutional.") Thus "[a] condition which might not ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended period of time." *Id.* (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996)); *see also Patterson v. Kistousky*, 2010 WL 5490653, at *3 (N.D. Ill. Dec. 30, 2010) (Zagel, J.) (citing case where temporary electrical wiring issue that caused an inmate to be shocked twice over a nine-day period did not violate the Eighth Amendment, but holding that because "Plaintiff allege[d] multiple electrical shocks over a two month period" with "[t]he actual number of times Plaintiff was shocked and the extent of those shocks" unknown, "a

---

[4] Courts outside the Seventh Circuit also have found that exposure to human waste and deprivation of water are unconstitutional conditions of confinement. *See, e.g., DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (exposure to human waste for 36 hours was sufficiently serious deprivation because it "evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eigth Amendment."); *Martino v. Casey*, 563 F.Supp. 984, 999 (D.Or. 1983) ("Functioning plumbing, including toilets, sinks and showers, is a basic necessity of civilized life. The provision of adequate means of hygiene, and the sanitary disposal of bodily waste so that the waste does not contaminate cells, are constitutionally required."); *Heitman v. Gabriel*, 524 F.Supp. 622 (W.D. Mo. 1981) ("No inmate shall be confined for more than one hour in any locked cell which does not have working plumbing.")

genuine issue of material fact exists as to whether the conditions in the shower violated the Eighth Amendment").

Here, Mims's three emergency grievance forms are contemporaneously-created evidence indicating that the Defendants had not repaired Mims's cell as of June 8, July 1, and July 10, 2011. This evidence is consistent with the allegation in Mims's Complaint that he was deprived of a working toilet for 45 days. On the other hand, Defendants have submitted a copy of a spreadsheet summarizing all IDOC work orders for June through August 2011. (Dkt. No. 60.) While Defendants have not supplied an actual work order pertaining to Mims's cell, the spreadsheet indicates that plumbing issues in the cell were documented on June 7, 2011 and repairs were completed on June 17, 2011. (*Id.*)

Also unclear from the record before the Court is the extent to which Mims was able to access a toilet outside of his cell while the plumbing in his cell was non-functional. The Defendants have provided evidence demonstrating that Mims had access to a working toilet whenever he went to work in the prison's laundry area. (Mims Dep., p. 22.) However, it is unclear how much time Mims actually spent at work. (*Id.*) Mims testified that he generally worked about six hours per day whenever he was called in but also stated that he "was having a lot of days off because [his] supervisor wasn't there" and that he could not work during the four days the prison was on lockdown.[5] (*Id.*, p. 23.) The Defendants have not submitted evidence detailing Mims's work schedule, nor have they indicated how often Mims was allowed to be escorted to a toilet outside of his cell between June 1 and July 14, 2011.

---

[5] An inmate-plaintiff's deposition testimony and affidavit describing his conditions of confinement are "sufficient to create a disputed issue of fact." *Morris v. Ley*, 331 Fed.Appx. 417, 420–21 (7th Cir. 2009) (unpublished) (citing *Payne v. Pauley*, 337 F.3d 767, 770–71 (7th Cir. 2003)).

With respect to the severity of the conditions in Mims's cell, Mims testified that poor air circulation contributed to the poor conditions of his confinement and stated in his grievance forms that the heat index reached 96 and 100 degrees. (*Id.*, p. 40; Dkt. No. 60, Ex. E.) The Defendants have not presented evidence to the contrary. Mims also stated at his deposition that during the entire time period his toilet was broken, prison staff came only three times to provide him with buckets of ice to flush his toilet. (Mims Dep., p. 24–25.) Defendants state only that Mims was provided buckets of ice to flush the contents of his toilet but do not dispute Mims's contention that they were provided on only three occasions during the relevant time period.

Construing these facts in the light most favorable to Mims, the Court finds that given the conditions Mims describes – a non-functioning sink, a broken toilet, the smell of feces, temperatures at or close to 100 degrees Fahrenheit, and poor air circulation, all for a period of 45 days – a reasonable jury could find that Mims's conditions of confinement were sufficiently serious to deprive him of the minimal civilized measures of life's necessities. Thus the issue must be decided by a trier of fact and not by this Court under the summary judgment rule. *Cf. Dixon*, 114 F.3d at 643 ("Though we do not say that it can never be resolved on summary judgment, the question of whether the severity of the cold, in combination with the length of time in which the inmate had to endure it, was sufficient to violate the Eighth Amendment is one which will often be peculiarly appropriate for resolution by the trier of facts.").

### B. Deliberate Indifference

With respect to whether the Defendants acted with "deliberate indifference," the Supreme Court has made clear that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' " *Farmer*, 511 U.S. at 837. This means that "an official's failure to alleviate a significant risk that he should have perceived but did not,

while no cause for commendation, cannot … be condemned as an infliction of punishment." *Id.* at 838. Accordingly, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. This type of deliberate indifference "implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). "[M]ere negligence or even gross negligence does not constitute deliberate indifference," *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996), and it is not enough to show that a prison official merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995), *abrogated on other grounds*, *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).

In this case there is a factual dispute as to whether Defendants Hardy, Sanders, Coleman, and Edwards were deliberately indifferent. Mims's emergency grievance forms demonstrate that as of July 6, 2011, Defendants Sanders and Hardy were aware of the conditions in Mims's cell. The grievance forms reviewed by Sanders and Hardy provide detailed descriptions of the problem in Mims's cell, identifying the lack of running water, broken toilet, and intolerable heat indices. The forms also informed Sanders and Hardy that the conditions had persisted for over a month. Mims also wrote a series of letters to Defendants Coleman and Edwards in June and July 2011 describing the conditions in his cell and stating that those conditions had existed since June 1, 2011. Viewing this evidence in the light most favorable to Mims, the Court finds that a reasonable jury could conclude that these defendants were aware of Mims's conditions of

confinement and acted with deliberate indifference by allowing those conditions to persist for as long as they did. Accordingly, whether Defendants Hardy, Sanders, Coleman, and Edwards acted with deliberate indifference to Mims's conditions of confinement is a material dispute of fact that the fact finder must resolve at trial.

However, Mims has not raised a genuine issue of material fact over whether Defendant Jose Prado acted with deliberate indifference. An official who had actual knowledge of an excessive risk to the health or safety of an individual is "free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that [he was] deliberately indifferent." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (citing *Farmer*, 511 U.S. at 844–45); *Wynn v. Kaupas*, No. 05 C 102, 2007 WL 433537, at *5 (N.D. Ill. Feb. 6, 2007). In all three of Mims's emergency grievance forms, Mims states that Prado attempted to resolve the issues in his cell by placing work orders to have the plumbing repaired. While these efforts, according to Mims's account, proved fruitless, the grievance forms belie the suggestion that Prado did not respond to the risk in a reasonable manner. Therefore summary judgment in favor of Defendant Prado is proper.

## CONCLUSION AND ORDER

For the reasons stated, the Board's motion for summary judgment is granted with respect to Defendant Prado and denied with respect to Defendants Hardy, Sanders, Coleman, and Edwards. Counsel shall be appointed to Plaintiff for further proceedings.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 5, 2013

21